## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**LARA FORSMAN,**

      **Plaintiff,**

    v.

**CHAD SILVERSTEIN,** *et al.*,

      **Defendants.**

:

:

**Case No. 2:22-cv-4415**
**Chief Judge Sarah D. Morrison**
**Magistrate Judge Chelsey M. Vascura**

### OPINION AND ORDER

In December 2022, Choice Recovery, Inc. fired Lara Forsman after she failed to return certain funds to the company upon request. Ms. Forsman then brought this action against Choice Recovery and Chad Silverstein (its CEO and Board Chairman), asserting that her termination was wrongful and in breach of her employment agreements, among other claims.

The parties filed cross-motions for summary judgment on Ms. Forsman's claims and Choice Recovery's counterclaim (ECF Nos. 39, 47), which Motions are fully briefed and ripe for consideration. For the reasons set forth below, both Motions are **GRANTED in part** and **DENIED in part**.

## I.    STATEMENT OF FACTS

Choice Recovery[1] was a debt collection agency that assisted clients in recovering unpaid bills. (ECF No. 39-3 ("First Silverstein Aff."), ¶ 1.) In 2013, Mr.

---

[1] Although Choice Recovery is now known as Built to Leave, Inc., the Court will refer to the company as "Choice Recovery" throughout this Opinion and Order.

Silverstein became Choice Recovery's sole owner and shareholder. (*Id.*, ¶ 2.)

### A.  Ms. Forsman's Employment and Compensation Structure

Mr. Silverstein hired Ms. Forsman in late December 2018 in hopes that she would eventually manage the daily operations of the company. (First Silverstein Aff., ¶ 5.) For a trial period during her first year of employment, she served as the COO while Mr. Silverstein remained the President and CEO. (*Id.*; ECF No. 56-1 (sealed) / 47-1 (redacted) ("First Forsman Decl."), ¶ 4.) Her compensation at that time included a base salary of $175,000 and a discretionary bonus of $100,000. (ECF No. 44-5 (sealed) / ECF No. 45-5 (redacted) ("Silverstein Dep."), 21:22-23.)

Ms. Forsman is the minority owner of a separate company called Keep IT Simple Solutions, LLC ("KISS"). (ECF No. 44-1 (sealed) / ECF No. 45-1 (redacted) ("Forsman Dep."), 73:19–74:6.) Choice Recovery provided KISS with IT and other support services, including payroll processing, so the two entities shared a payroll platform. (*Id.*, 75:14–77:17; First Forsman Decl., ¶¶ 40–42.)

#### 1.  Employment Agreement

Choice Recovery employed Ms. Forsman on an at-will basis as a W-2 employee. (Forsman Dep., 48:22–49:3, 68:15-19.) During her initial trial period, she did not have a written employment agreement. (*Id.*, 23:14-17; First Silverstein Aff., ¶ 6.) However, effective February 2020, she and Choice Recovery entered into an Employment Agreement (ECF No. 8-1 (sealed) / ECF No. 16-1 (redacted)), which, in relevant part, outlined a threefold compensation structure:

(1) Base Salary: a fixed annual salary of $275,000. (*Id.*, Section 3.1.)

(2) Income Incentive: "For each year beginning with calendar year 2020," an incentive payment amounting to a percentage of Choice Recovery's "net, net, net income after distributions & taxes." (*Id.*, Section 3.2.) Exhibit A to the Employment Agreement set forth a growth-based compensation plan (the "Model") that Choice Recovery used to arrive at this value. (*Id.*, Ex. A.) Ms. Forsman created and updated the Model at least annually with Mr. Silverstein's approval. (Forsman Dep., 45:16-18, 49:22-23, 99:7-15.)

(3) Interest in Choice Recovery: As stated in the Employment Agreement:

> [Ms. Forsman] shall be eligible to receive a right that gives her the opportunity to receive up to 50% of the value of the Company upon a sale of the Company beginning January 1, 2020 and at the end of every twelve (12) months of employment thereafter to a maximum aggregate right equal to no more than fifty percent (50%) of the aggregate number of shares of common stock issued and outstanding, with such rights being awarded as described on Exhibit A (the "Interest"). Upon a sale or other transaction resulting in a transfer to a person unrelated to [Mr. Silverstein] (other than [Ms. Forsman]) of all or substantially all the assets of the Company or at least fifty percent (50%) of the common stock of the Company, [Ms. Forsman] shall receive the proportionate share of the net proceeds realized from such sale as described on Exhibit A (in the case of a sale of 100% of the assets or common stock, or such proportionate share as described on Exhibit A relative to the percentage of assets or common stock sold if less than 100% is sold) associated with her then current Interest percentage relative to the aggregate number of shares of common stock then issued and outstanding … Any consideration [Ms. Forsman] receives upon the exercise of the Interest will be ordinary income[.]

(*Id.*, Section 3.3.) In plainer English, this component, also referred to as "phantom stock," contemplates Ms. Forsman's receipt of up to 50% of the proceeds of any sale of Choice Recovery, even though she was not a company shareholder. (Forsman Dep., 34:15-20, 42:5-21, 65:1-18.) The percentage of Ms. Forsman's Interest at the

3

time of any sale would determine how much she would receive from the proceeds. (*Id.*, 65:14-18.) However, if she was terminated for Cause,[2] she would forfeit her right to any sale proceeds. (Employment Agreement, Section 6.)

### 2.    Holders Agreement

In conjunction with the execution of the Employment Agreement, Ms. Forsman entered into a Holders Agreement with Choice Recovery and Mr. Silverstein. (ECF No. 8-2.) The Holders Agreement identified Mr. Silverstein as the sole "Shareholder" (holding "all of the issued and outstanding common shares" of Choice Recovery) and Ms. Forsman as the "Rights Holder" (holding the Interest granted by the Employment Agreement). (Holders Agreement, PAGEID # 168; *see also* Forsman Dep., 34:15-20, 35:13-18.) As to the Interest, the Holders Agreement stated:

Until the Rights Holder has achieved the right to receive fifty percent

---

[2] The Employment Agreement defines "Cause" as follows:

"Cause" means if [Choice Recovery] terminates this Agreement because [Choice Recovery] determines, in its sole discretion, that [Ms. Forsman] (a) willfully failed to follow a lawful directive from the Board with respect to a business matter of [Choice Recovery], (b) breached her duty to [Choice Recovery] or commits fraud against [Choice Recovery], (c) engaged in conduct that pursuant to the terms of [Choice Recovery's] Employee Handbook would give rise to termination of employment, (d) embezzled funds or misappropriated assets of [Choice Recovery], (e) is convicted or pleads guilty or no contest to a felony or any crime involving dishonesty or fraud, (f) has breached any provision of Article V of this Agreement, or (g) has materially breached any other provision of this Agreement if such breach of such provision is not cured within thirty (30) days after written notice from [Choice Recovery] of such breach.

(Employment Agreement, Section 6.)

(50%) of the Interest under the Employment Agreement, the rights of the Rights Holder hereunder will be described as "Unvested." After the Rights Holder has achieved the right to receive at least fifty percent (50%) of the Interest under the Employment Agreement, the rights of the Rights Holder hereunder will be described as "Vested."

(Holders Agreement, PAGEID # 168.)

The Holders Agreement did not grant Ms. Forsman any entitlement to dividends, voting rights, or any other shareholder rights. (*Id.*; *see also* Forsman Dep., 37:3-14.) If Ms. Forsman voluntarily ended her employment with Choice Recovery, her Interest would "cease accruing any additions as of such date of separation from [Choice Recovery], but she [would] be entitled to retain her Interest as long as such Interest [was] greater than 10% at that time." (Holders Agreement, Section 2.4; *see also* Employment Agreement, Section 3.3.)

### 3.    Ms. Forsman's 2020-2021 Compensation

Upon entering the Employment and Holders Agreements, Ms. Forsman became President of Choice Recovery, and Mr. Silverstein remained CEO. (Employment Agreement, Section 1.1.) For the 2020 and 2021 calendar years, Ms. Forsman received her contractual base salary and phantom stock Interest allocation, and she was awarded an Income Incentive. (Forsman Dep., 108:17-18, 111:10-14; ECF No. 39-6, PAGEID # 823; ECF No. 39, PAGEID # 648–49.) In February 2022, Choice Recovery's Board of Directors (composed only of Mr. Silverstein, *see* Forsman Dep., 46:7-12) approved and adopted an updated Model providing that as of January 1, 2022, Ms. Forsman had earned a 12.15% phantom stock Interest. (First Forsman Decl., ¶ 17; First Silverstein Aff., ¶ 13.)

### B.     Sale of Choice Recovery's Assets

In December 2021, Mr. Silverstein decided to sell substantially all of the assets of Choice Recovery. (First Silverstein Aff., ¶ 10.) After negotiating with multiple potential purchasers, Choice Recovery and Mr. Silverstein entered into an Asset Purchase Agreement (ECF No. 39-9 (sealed) / ECF No. 46-1 (unredacted)) with Wakefield & Associates on October 1, 2022. (First Silverstein Aff., ¶¶ 10, 12.) Per the terms of the sale, Wakefield agreed to pay Choice Recovery an amount in cash proceeds (a percentage of which was to be held in escrow) and an amount encompassed by a promissory note. (First Forsman Decl., ¶ 19; Silverstein Dep., 84:3-12; ECF No. 47, PAGEID # 1323–24.)

Certain of Choice Recovery's assets were carved out of the sale. (Asset Purchase Agreement, Section 1.2.) As relevant here, Choice Recovery retained any Employee Retention Credit ("ERC") funds, which were offered by the IRS as part of a government program created to alleviate the economic impacts of the COVID-19 pandemic and for which Choice Recovery had applied in February 2022.[3] (*Id.*, Section 1.2(g); First Silverstein Aff., ¶ 11.) Choice Recovery received ERC funds in August 2022 and January 2023. (First Silverstein Aff., ¶ 16.) The funds received in January 2023 were booked for accounting purposes in 2023. (ECF No. 59-1 ("Second Silverstein Aff."), ¶ 6.)

---

[3] Because Choice Recovery performed payroll processing for KISS, Choice Recovery applied for ERC funds both on its own behalf and on behalf of KISS. (Forsman Decl., ¶¶ 41–42.)

### C.  Ms. Forsman's Transfer of Funds and Resulting Termination

Choice Recovery ceased collection activities in October 2022 following the sale to Wakefield. (Second Silverstein Aff., ¶ 8.) Two days after the sale closed, Wakefield paid Choice Recovery a portion of the gross sale proceeds; Mr. Silverstein immediately took a shareholder distribution of approximately 65% of his share of the proceeds. (First Silverstein Aff., ¶ 12; Silverstein Dep., 110:8-13.)

The parties agree that Ms. Forsman's Interest at the time of the sale was 12.15%, so Mr. Silverstein authorized her to withdraw 65% of her 12.15% Interest in Wakefield's initial payment. (First Silverstein Aff., ¶ 13; First Forsman Decl., ¶¶ 16, 23; Forsman Dep., 136:1-6; *see also* Employment Agreement, Section 3.3.) Thereafter, Ms. Forsman transferred approximately $922,367 from Choice Recovery's business checking account into KISS's account (over which she had control). (Forsman Dep., 134:12-24, 140:6-17.) Because of the way she transferred the funds, the payment was not processed through Choice Recovery's payroll system for tax purposes. (*Id.*; ECF No. 39-10, PAGEID # 874.)

The day after she transferred the initial funds, Mr. Silverstein texted Ms. Forsman that she had "transferred too much" and that she needed to "transfer some funds back." (ECF No. 64, PAGEID # 1929; Silverstein Aff., ¶ 14.) Ms. Forsman then returned $90,000 to Choice Recovery's bank account. (Forsman Dep., 139:10-17; Silverstein Aff., ¶ 14; First Forsman Decl., ¶ 23.) But throughout November 2022, still believing that Ms. Forsman had transferred too much, Mr. Silverstein directed her several times to return all of the transferred funds so that Choice

Recovery could process the corresponding payroll taxes. (Forsman Dep., 143:22–144:1.) Although Ms. Forsman did not object to the money being "run through" the payroll system, she did not return it. (First Forsman Decl., ¶ 25.)

In December 2022, Choice Recovery's accountant (Kazim Unalan) confirmed to Ms. Forsman and Mr. Silverstein that Ms. Forsman's share of the sale proceeds should have been processed and paid through Choice Recovery's payroll system. (ECF No. 39-10, PAGEID # 874.) Mr. Unalan informed them that "the last payroll run is 12/16/22 so [they] need to get things straightened out by then" to avoid "issues for all involved that would be very difficult or impossible to correct after year end." (*Id.*) Mr. Unalan also suggested that the payroll provider determine the amount due for payroll taxes and withholdings, so that Ms. Forsman would only need to remit the taxes as opposed to the entirety of the transferred funds; Mr. Silverstein agreed with this suggestion. (*Id.*; First Forsman Decl., ¶ 30.)

But as of December 5, Ms. Forsman had still not returned any more funds, so Choice Recovery's corporate counsel sent her a letter instructing her to do so:

> As you also know, you withdrew $832,362.67[4] from Choice's business checking account … for the payment of proceeds from the sale of Choice. While there may be a disagreement as to the total amount to which you are entitled in connection with the sale, it is clear that under your Executive Employment Agreement all such amounts are ordinary taxable income (*i.e.*, in this case, no different than your salary). As such, and as you have been advised a number of times including by [Mr. Unalun], those amounts are subject by law to mandatory withholding by Choice for various payroll tax liabilities (in this case federal income and Medicare) and reporting and payment to

---

[4] This amount represents the initial $922,367 transfer minus the $90,000 returned.

the IRS on a regular basis (no less often than quarterly). Choice is subject to penalties and interest for untimely reporting and payment.

It appears you have been provided with the calculation of the required withholding from the "11/18/22 Manual Check" payroll run on the amount you withdrew indicating the Employee Taxes are … a total of $325,973.47 (copy attached). Without further delay, return that amount to Choice or work with Kim Weprin (who has continued to assist Choice with its accounting/payroll) so that Choice can fulfill its legal obligation to withhold, report and pay the taxes to the IRS. We understand the final payroll has to be completed before December 16, 2022, so that it can be processed before year-end.

(ECF No. 9-1, PAGEID # 295.)

In a final attempt, Mr. Silverstein instructed Ms. Forsman to return the funds by December 16 for processing. (ECF No. 39-12, PAGEID # 881.) Ms. Forsman disagreed with the significance of the December 16 deadline and believed that it would result in "adverse tax consequences" for Choice Recovery and Mr. Silverstein. (First Forsman Decl., ¶¶ 31–33.) Ms. Weprin told her that payroll would need to be completed no later than December 27, so Ms. Forsman forwarded Ms. Weprin's email with this alternative deadline to Mr. Silverstein and Mr. Unalan. (*Id.*; ECF No. 47-5, PAGEID # 1418–19.) She did not return any more funds by December 16. (*Id.*)

Choice Recovery subsequently terminated Ms. Forsman for Cause:

The company has determined that your transfer on October 3, 2022 of $832,362.67 from Choice Recovery's business checking account to your own accounts and failure to return the funds after being advised and directed multiple times by our Board / [Mr. Silverstein], company accountants, and corporate legal counsel to do so constitutes a direct breach of your duty to the company and willful failure to follow a lawful directive from the Board, among other grounds amounting to Cause for termination.

9

(ECF No. 39-13, PAGEID # 888.) Her termination was effective December 17, and Choice Recovery again demanded that she return the entire amount of the transferred funds. (*Id.*)

On December 21, Ms. Forsman wired the approximate payroll tax amount ($325,973.47) to Choice Recovery. (First Forsman Decl., ¶ 35; ECF No. 47-5, PAGEID # 1423.)

## II. PROCEDURAL BACKGROUND

Ms. Forsman commenced this action against Mr. Silverstein (ECF No. 1) and thereafter amended her Complaint to add Choice Recovery as a Defendant.[5] (Am. Compl., *generally*.) She asserts several causes of action stemming from her termination:

- Breach of Fiduciary Duty (Count II);
- Wrongful Termination (Count III);
- Breach of Contract (Count IV);
- Unjust Enrichment (Count V); and
- Accounting (Count VI).

(*Id.*, ¶¶ 54–71.) Ms. Forsman also requests a declaratory judgment (Count I) that (1) she is entitled to her share of the sale proceeds, the ERC Credits, and the company's income and equity as of September 30, 2022; and (2) she is not required to repay any sums to Choice Recovery. (*Id.*, ¶¶ 51–53.)

---

[5] Shortly after Ms. Forsman filed her Amended Complaint (ECF No. 8), the parties sought to seal three exhibits attached thereto. (ECF No. 10.) With the Court's permission (ECF No. 12), Ms. Forsman refiled the Amended Complaint and attached only the redacted versions of the three exhibits. (ECF No. 16.) Because the originally filed Amended Complaint (ECF No. 8) includes all exhibits, the Court will refer to that filing in this Opinion.

In response, Defendants answered, and Choice Recovery counterclaimed, seeking a declaratory judgment that Ms. Forsman is not an equity shareholder, is not entitled to the sale proceeds or any additional incentive-based compensation with respect to the ERC Credits, and forfeited any rights to past or future Interest. (Answer, PAGEID # 291–92.)

## III. MOTION TO STRIKE OR FOR LEAVE TO FILE SUR-REPLY

Defendants moved to strike Ms. Forsman's Reply in support of her Motion for Summary Judgment (ECF No. 61) because she filed it a week after the deadline and because it exceeds the Court's page limitation. (ECF No. 65.) In the alternative, Defendants asked for leave to file a sur-reply, arguing that Ms. Forsman's Reply contained new allegations and arguments. (*Id.*, PAGEID # 1932.) Ms. Forsman opposed Defendants' Motion to Strike and moved for leave to file her Reply out of rule. (ECF No. 66.) She also responded to Defendants' proposed sur-reply. (*Id.*)

Motions to strike arguments are generally disfavored. *See O'Banion v. Am. Aggregates Corp.*, No. 1:19-CV-841, 2020 WL 13469259, at *2 (S.D. Ohio July 23, 2020) (Bowman, M.J.). Whether to strike a document other than a pleading is within the trial court's sound discretion. *Id.* at *1.

Ms. Forsman says that her untimely filing was "inadvertent and the product of excusable neglect." (ECF No. 66, PAGEID # 1943.) Although litigants are responsible for knowing and following the rules of procedure, Defendants do not argue that they were prejudiced by the late and lengthy filing. Defendants' Motion is therefore **DENIED** to the extent that it requests striking Ms. Forsman's Reply.

11

But Ms. Forsman raised arguments concerning Choice Recovery's accrual and accounting methods for the first time in her Reply. (ECF No. 61, PAGEID # 1900.) The Court finds that good cause exists for Defendants to submit an additional memorandum to respond to those issues. Thus, Defendants' Motion is **GRANTED** to the extent that it requests leave to file their proposed sur-reply (ECF No. 65-1).

The portion of Ms. Forsman's response in opposition to Defendants' Motion to Strike that addresses Defendants' sur-reply, however, will be disregarded. Defendants did not raise any new arguments in their sur-reply, and Ms. Forsman did not seek leave to respond to it.

## IV.   CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A.    Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398

U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

The standards upon which a court evaluates motions for summary judgment "do not change simply because the parties present cross-motions." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (citation omitted).

**B.    Analysis**

For ease of analysis, the Court discusses each of Ms. Forsman's claims and Choice Recovery's counterclaim out of order below.

**1.    Breach of Contract (Count IV)**

Under Ohio law,[6] "[t]he elements of a breach of contract claim are the

---

[6] In a diversity action, the forum state's choice-of-law rules determine which state's substantive law will apply to the dispute. *Miller v. State Farm Mut. Auto. Ins. Co.*, 87 F.3d 822, 824 (6th Cir. 1996). Because the parties rely exclusively upon Ohio law in their briefings, the Court will apply Ohio law. *See Wilkes Assocs. v. Hollander Indus. Corp.*, 144 F. Supp. 2d 944, 949 n.4 (S.D. Ohio 2001) (Rice, J.) (quoting *ECHO, Inc. v. Whitson Co., Inc.*, 52 F.3d 702, 707 (7th Cir. 1995)) ("Where neither party argues that the forum state's choice-of-law rules require the court to apply the substantive law of another state, the court should apply the forum state's substantive law.").

existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Eagle Express, Inc. v. Paycor, Inc.*, No. 1:23-CV-655, 2024 WL 1874966, at *8 (S.D. Ohio Apr. 30, 2024) (Cole, J.) (citing *Becker v. Direct Energy, LP*, 112 N.E.3d 978, 988 (Ohio Ct. App. 2018)). Ms. Forsman contends that Defendants breached the Employment Agreement and the Holders Agreement by refusing to pay her compensation that she earned prior to her termination, namely (1) her 12.15% Interest in the remaining proceeds from Choice Recovery's sale to Wakefield; (2) her Income Incentive for 2022 (amounting to 70% of the company's "net, net, net income after distributions and taxes"); (3) a portion of the ERC credits paid to Choice Recovery; and (4) the ERC credits paid to KISS. (ECF No. 47, PAGEID # 1334–35.) Defendants dispute Ms. Forsman's entitlement to this compensation. (ECF No. 39, PAGEID # 641.)

When construing a contract, a court's role "is to ascertain and give effect to the intent of the parties," which is "presumed to reside in the language they chose to employ in the agreement." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997) (citation omitted). If the terms of a contract are clear and unambiguous, "there is no issue of fact to be determined," and courts must enforce the contract as written. *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 683–84 (6th Cir. 2000) (applying Ohio law). Common terms must be given "their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line C*o., 374

14

N.E.2d 146, 150 (Ohio 1978). Technical terms must be "given their technical meaning" unless a different intention is clearly expressed. *Foster Wheeler*, 678 N.E.2d at 526 (citation omitted).

A contract will require further analysis only if a court finds the at-issue language ambiguous. Contractual language is ambiguous "where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio Ct. App. 2003). "[T]he interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (applying Ohio law).

With these principles in mind, the Court turns to the four categories of compensation to which Ms. Forsman asserts she is entitled.

### a) Interest in Sale Proceeds

In exchange for substantially all its assets, Choice Recovery was to receive $13 million from Wakefield, comprised of (1) $9 million in cash proceeds, subject to applicable adjustments and holdbacks and reduced by $900,000 held in escrow until November 2023; and (2) $4 million in proceeds to be paid pursuant to a promissory note.[7] (ECF No. 47, PAGEID # 1323–24; First Forsman Decl., ¶¶ 19, 37–38.)

---

[7] The Court relies on Ms. Forsman's sworn declaration for these figures rather than the Asset Purchase Agreement because, though Defendants submitted a redacted copy of the agreement with their summary judgment motion (ECF No. 39-9), they submitted only excerpts of the unredacted agreement (ECF Nos. 46-1, 59-1). Ms. Forsman verified under penalty of perjury that her account of these

Because Ms. Forsman represents that she has already taken her share of $6,896,862.92 (the net sale proceeds paid outright by Wakefield in October 2022, *see* First Forsman Decl., ¶ 19), only the $900,000 placed in escrow and the $4 million under the promissory note remain at issue. Ms. Forsman asserts that she should receive 12.15% of these funds,[8] such that she is owed (1) $109,350 of the escrow funds ($900,000 x .1215); and (2) $486,000 of the promissory note payments ($4,000,000 x 12.15%) plus interest. (ECF No. 47, PAGEID # 1330, 1335; First Forsman Decl., ¶¶ 37–38.)

The Employment Agreement gave Ms. Forsman the opportunity to earn up to a 50% interest in the value of the Choice Recovery, beginning January 1, 2020. (Employment Agreement, Section 3.3.) Then, "[u]pon a sale or other transaction resulting in a transfer … of all or substantially all the assets of the Company," she was to "receive the proportionate share of the net proceeds realized from such sale as described on Exhibit A … associated with her then current Interest percentage[.]" (*Id.*) At the time Choice Recovery was sold in October 2022, she had earned a 12.15% Interest. (First Forsman Decl., ¶ 17; First Silverstein Aff., ¶ 13.)

---

figures is correct, and Defendants do not dispute her calculations.

[8] The Amended Complaint also seeks recovery of 12.15% of Choice Recovery's remaining cash as of September 30, 2022, which was not part of the sale. (Am. Compl., ¶ 43.) Although Defendants addressed this issue in their summary judgment briefing (ECF No. 39, PAGEID # 663), Ms. Forsman did not respond. Because the plain language of the Holders Agreement and the Employment Agreement indicate that Ms. Forsman's 12.15% Interest only relates to her share of net proceeds from a sale, she does not have any Interest in Choice Recovery's remaining cash. The Court **GRANTS** summary judgment to Defendants as to this issue.

Thus, the Employment Agreement entitles Ms. Forsman to 12.15% of the net proceeds of the sale of Choice Recovery, including those initially paid outright by Wakefield, those placed in escrow, and those encompassed by the promissory note.

Defendants argue that Ms. Forsman forfeited her Interest when she was terminated for Cause. (ECF No. 39, PAGEID # 662.) And the Employment Agreement does provide that Ms. Forsman "will forfeit the Interest" if she is terminated for Cause. (Employment Agreement, Section 6.) However, this language must be read in the context of other language in the Agreement that provides that "upon a sale," Ms. Forman "shall" receive an Interest in the sale proceeds—the condition precedent to her right to receive her Interest was met at the time of Choice Recovery's sale.[9] *See U.S. Postal Serv. v. Spodek*, No. 3:11-CV-1878, 2012 WL 2711483, at *8 (N.D. Ohio June 20, 2012), *report and recommendation adopted*, 2012 WL 2711482 (N.D. Ohio July 9, 2012) (applying Ohio law) ("Once Plaintiff complied with the condition precedent, Defendant had an obligation to perform."); *see also* Restatement (Second) of Contracts § 224 (West) ("Performance under a contract becomes due when all necessary events, including any conditions … have occurred[.]"). That portions of the proceeds were not paid until after Ms. Forsman's termination does not change their character as proceeds or implicate any forfeiture.

Accordingly, summary judgment is **GRANTED** in favor of Ms. Forsman on

---

[9] Although the parties disagree as to the exact timing of Ms. Forsman's separation from Choice Recovery, they agree that she was an employee at the time of sale. (ECF No. 61-1 ("Second Forsman Decl."), ¶ 2; ECF No. 60, PAGEID # 1886 n.4; Second Silverstein Aff., ¶ 1.)

this issue. Specifically, the Court grants judgment to her in the amount of (1)

$109,350 for the escrow funds, and (2) $486,000 plus interest for the promissory

note. Defendants' motion for summary judgment is **DENIED** as to this issue.

### b)     Income Incentive

Ms. Forsman next argues that she is entitled to 70% of Choice Recovery's net,

net, net income after distributions and taxes of the company's 2022 operations up

through September 30, 2022. (ECF No. 47, PAGEID # 1337.)

The Employment Agreement states that "[f]or each year beginning with

calendar year 2020," Ms. Forsman would receive a percentage of Choice Recovery's

"net, net, net income after distributions & taxes." (Employment Agreement, Section

3.2.) Focusing on the introductory phrase "for *each year* beginning with *calendar*

*year* 2020," Defendants argue that the Employment Agreement does not

contemplate a payout for a partial year when distributions and taxes were not

allocated or paid and when there were no final year-end results or financial

statements for a calendar year. (ECF No. 39, PAGEID # 661; ECF No. 60, PAGEID

# 1882 (emphasis in original); Silverstein Aff., ¶ 8.) They assert that the Income

Incentive was predicated on having final calendar year results, a condition

precedent that did not occur in 2022. (ECF No. 60, PAGEID # 1882.) Ms. Forsman

argues that the Employment Agreement does not require that she be employed by

the company for a full calendar year to be entitled to the Income Incentive.  (ECF

No. 47, PAGEID # 1338; ECF No. 58, PAGEID # 1827.)

When reviewing the Employment Agreement and resolving any ambiguity,

the Court must "read words and phrases in context and apply the rules of grammar and common usage." *Coniglio v. CBC Servs., Inc.*, No. 5:12CV1773, 2013 WL 3776179, at *2 (N.D. Ohio July 16, 2013) (citation omitted) (applying Ohio law). These rules favor Ms. Forsman's interpretation of the provision. For example, under the doctrine of the last antecedent, "a limiting clause or phrase ... should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). In this case, the word "calendar" in the Employment Agreement modifies when the incentive begins ("beginning with calendar year 2020")—not the time period over which the incentive extends ("[f]or each year"). The language explains that Ms. Forsman was to receive the incentive starting in "calendar year 2020" and continuing every "year" thereafter. Contrary to Defendants' position, it does not state that the incentive would apply "[f]or each calendar year," "each complete year," "each full year," or the like. And Defendants could have drafted the agreement to specify that the incentive would only be given after the completion of a calendar year, but they did not do so.[10]

Further, "an employee bonus plan by which the employer offers to pay a bonus based upon the company's annual net profit gives rise to a contractual obligation on the part of the employer." *McKelvey v. Spitzer Motor Ctr., Inc.*, 545 N.E.2d 1311, 1313 (Ohio Ct. App. 1988). Here, Choice Recovery considered the Income Incentive as a "performance incentive," or a bonus. (ECF No. 39, PAGEID

---

[10] In practice, Ms. Forsman testified that the company did not always wait until the financials were finalized at year-end to pay her an incentive amount and in some instances made "pay-outs" based on forecasts. (Forsman Dep., 50:10–53:23.)

# 644; ECF No. 60, PAGEID # 1884 n.3; Silverstein Dep. 28:1–30:8.) The Employment Agreement provides that the Incentive was not discretionary on Choice Recovery's part. (Employment Agreement, Section 3.2 ("For each year beginning with calendar year 2020, Executive *shall* receive a percentage ....") (emphasis added)); *cf.*, *Mazzitti v. Garden City Grp., Inc.*, No. 06AP-850, 2007 WL 1847688, at *12–13 (Ohio Ct. App. June 28, 2007) (concluding employee failed to show breach of contract when bonus not guaranteed).

The parties entered into a contract by which Ms. Forsman would be paid 70% of the annual net, net, net income after distributions and taxes. She was to receive this incentive each "year," beginning with "calendar year 2020." All contractual conditions precedent (but for continued operation of the company or her termination) were met. Ms. Forsman is entitled to her Income Incentive for 2022, and summary judgment is **GRANTED** in her favor on this issue. Summary judgment is **DENIED** for Defendants on this issue.

### c) Choice Recovery's ERC Funds

In 2022 and 2023, Choice Recovery applied for and received ERC funds. (First Silverstein Aff., ¶ 11.) The ERC program offered refundable payroll tax credits for qualified wages paid to employees in 2020 and 2021. (Unalan Dep., 40:10-22, 79:1-14.) Ms. Forsman argues that she is entitled to 70% of the ERC funds received by Choice Recovery because they are qualifying income under the Income Incentive formula in the Employment Agreement. (ECF No. 47, PAGEID # 1341.) Defendants dispute that the ERC funds should be considered income, but even assuming so,

20

they argue that Ms. Forsman is not entitled to a percentage because Choice Recovery did not receive the majority of the funds until after she left the company. (ECF No. 39, PAGEID # 658, 660.)

As stated above, the Employment Agreement defines Ms. Forsman's Income Incentive in the context of the company's "net, net, net income after distributions & taxes." (Employment Agreement, Section 3.2.) It does not define the term "income" as used for the Income Incentive formula but directs the reader to the formula set forth in the Model. (*Id.*) The Model includes figures for "Total Income," "Net, Net Income," "Net, Net, Net Income – After Distribution & Taxes," and the like, but it does not articulate what items comprise those figures. (Employment Agreement, Exhibit A; ECF No. 44-4 (sealed) / ECF No. 39-7 (redacted).) Instead, the Model is composed of the numbers appearing in the company's financial statements. (Forsman Dep., 55:19–56:3.)

Defendants narrowly interpret "income" as limited to Choice Recovery's revenue from collection fees, exclusive of ERC credits (ECF No. 39, PAGEID # 658); Ms. Forsman broadly interprets "income" as "a gain or recurrent benefit," including ERC funds (ECF No. 58, PAGEID # 1822–23). That the parties have suggested distinct interpretations does not create ambiguity. *See Tattletale Portable Alarm Sys., Inc. v. MAF Prods., Inc.*, No. 2:14-CV-00574, 2016 WL 5122545, at \*6 (S.D. Ohio Sept. 21, 2016) (Marbley, J.) (applying Ohio law) ("[A] contract term is not ambiguous simply because parties disagree about its meaning."). Instead, because the parties have not expressly defined "income" in the Employment Agreement, the

21

Court looks to the term's ordinary meaning. *Alexander*, 374 N.E.2d at 150.

The Merriam-Webster Dictionary defines "income" as "a gain or recurrent benefit usually measured in money that derives from capital or labor."[11] *See also Gamble v. Dobrosky*, 730 N.E.2d 969, 971 (Ohio 2000) (finding Merriam-Webster's Collegiate Dictionary to contain "the ordinarily accepted meaning" of a term). The ERC funds could fall within this broad definition. On the other hand, Black's Law Dictionary (12th ed. 2024) defines "income" as "the money or other form of payment that one receives, usu. periodically, from employment, business, investments, royalties, gifts, and the like." Using this narrower definition, though the ERC funds may impact Choice Recovery's income, they are intended to reduce tax liability. (Unalan Dep., 41:25–42:6 ("Q: All right. And so the money coming in from the credits at the end of the day is really income to the company? … A: Yes, by—by nature of reducing an expense.").

Because the term remains ambiguous, the Court must look to the extrinsic evidence to ascertain intent, including the parties' conduct surrounding the ERC funds. The parties did not contemplate ERC funds during their negotiation and execution of the Employment Agreement, as the company did not apply for them until 2022. (First Silverstein Aff., ¶ 11.) Choice Recovery received $97,814.24 in ERC funds in August 2022 and $1,660,909.53 in ERC funds in January 2023.  (*Id.*, ¶ 16; ECF No. 59-1, PAGEID # 1866.)

---

[11] Available at *https://www.merriam-webster.com/dictionary/income* (last accessed Sept. 30, 2024).

22

The parties agree that the ERC funds were "booked" as income for accounting purposes when they were received—2022 and 2023. (Unalan Dep., 92:3-11; Second Silverstein Aff., ¶ 6; Forsman Dep. 178:19-21; ECF No. 65-1, PAGEID # 1936.) Although the company amended its tax return for 2020 and for 2021 to account for the ERC refunds (ECF No. 60, PAGEID # 1883), the change did not affect its financial statements for 2020 or 2021 (*see* Unalan Dep., 91:18–92:11), and Ms. Forsman's Income Incentive was calculated using financial statements. (*See, e.g.*, Forsman Dep. 119:10-13 ("Q. And you in fact prepared that calculation of net, net, net less distribution and taxes on your model, right? A: I took it from the financial statements.").) And the Employment Agreement does not provide for recasting of Choice Recovery's income, nor does it contemplate after-the-fact increases (or decreases) in the Income Incentive amount.

Thus, as to the ERC funds received by Choice Recovery in August 2022, those funds would have been booked as income in 2022 and should be accounted for in her Income Incentive for 2022, pursuant to the Court's analysis in Section IV.B.1.b above. As to the ERC funds received and booked in 2023, Ms. Forsman's employment with Choice Recovery ended in 2022, so she is not entitled to an Income Incentive payment based on those funds.

Summary judgment is **GRANTED** in favor of Defendants and **DENIED** as to Ms. Forsman on this issue.

### d)    KISS's ERC Funds

When Choice Recovery applied for ERC funds, it did so for itself and for

KISS. (Forsman Decl., ¶¶ 41–42.) Ms. Forsman contends that she is entitled to the full amount of the ERC funds that Choice Recovery received on behalf of KISS. (ECF No. 47, PAGEID # 1342; ECF No. 61, PAGEID # 1900.) Defendants do not respond to this argument but admit that "Choice [Recovery] doesn't have an entitlement to KISS' money." (Silverstein Dep., 53:11-19.) Neither the Employment Agreement nor the Holder's Agreement address KISS's funds.

Pursuant to Article III of the United States Constitution, standing is necessary to the exercise of jurisdiction and "determin[es] the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "Once standing concerns arise—whether raised by defendants, or *sua sponte* by the Court in meeting its obligation to ensure its own jurisdiction—plaintiffs carry the burden to establish that standing requirements are met." *Solis v. Emery Fed. Credit Union*, 459 F. Supp. 3d 981, 988 (S.D. Ohio 2020) (Cole, J.) (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).

Injury is "the '[f]irst and foremost' of standing's three elements." *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). A shareholder of a corporation generally cannot satisfy Article III's injury requirement when suing "based solely on an injury to a corporation." *Old Blast, Inc. v. Operating Eng'rs Local 324 Pension Fund*, 663 F. App'x 454, 457 (6th Cir. 2016);

*see also In re Steffner*, 479 B.R. 746, 761 (Bankr. E.D. Tenn. 2012) ("[T]he property of a corporation or limited liability company belongs to that entity, not the owners of the entity."). Only where a shareholder alleges injuries separate and distinct from the corporation does she have Article III standing. *Id.*

Here, Ms. Forsman argues that Defendants improperly retained ERC funds belonging to KISS. But as far as the Court can discern, this is an injury to KISS that affects Ms. Forsman only indirectly as a minority owner. Thus, Ms. Forsman is hereby **ORDERED** to brief the issue of whether she has standing to assert a claim for KISS's ERC funds **within fourteen (14) days** from the date of this Opinion and Order. Defendants may respond **within seven (7) days** of Ms. Forsman's filing. No reply brief will be permitted.

### 2.    Unjust Enrichment (Count V)

In the alternative to her breach of contract claim, Ms. Forsman asserts an unjust enrichment claim. (Am. Compl., ¶¶ 64–69.) "Unjust enrichment operates in the absence of an express contract ... to prevent a party from retaining money or benefits that in justice and equity belong to another." *Robins v. Global Fitness Holdings, LLC*, 838 F. Supp. 2d 631, 646 (N.D. Ohio 2012) (internal quotations omitted). But "a plaintiff may not recover under the theory of unjust enrichment when an express contract covers the same subject." *Mitchell v. Cal. Casualty Gen. Ins. Co. of Or.*, No. 3:18-cv-228, 2019 WL 6877648, at *1 (S.D. Ohio Dec. 17, 2019) (Ovington, M.J.) (internal quotations omitted).

It is undisputed that Ms. Forsman's employment relationship with Choice

Recovery was governed by the Employment Agreement and the Holder's Agreement. Her compensation for performing her duties as President of Choice Recovery—the foundation of her unjust enrichment claim—is squarely addressed by the Employment Agreement. Accordingly, Ms. Forsman's unjust enrichment claim falls within the scope of the applicable agreements that are the subject of her breach of contract claim and is **DISMISSED**.

### 3.  Breach of Fiduciary Duty (Count II)

A "fiduciary relationship" is one in which "special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *Stone v. Davis*, 419 N.E.2d 1094, 1098 (Ohio 1981) (internal quotations omitted). A "fiduciary" has "a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking." *Strock v. Pressnell*, 527 N.E.2d 1235, 1243 (Ohio 1988). To prove a breach of fiduciary duty claim under Ohio law, a plaintiff must establish (1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom. *Gracetech Inc. v. Perez*, No. 96913, 2012 WL 589473, *4 (Ohio Ct. App. Feb. 23, 2012).

In this case, Ms. Forsman argues that Mr. Silverstein[12] breached his

---

[12] The Amended Complaint alleges a breach of fiduciary duty claim as to Mr. Silverstein only. (Am. Compl. ¶¶55–56.) However, Ms. Forsman asserts in her summary judgment briefing that Choice Recovery breached its fiduciary duty to her. (ECF No. 47, PAGEID # 1342.) Corporations as entities do not owe fiduciary duties to their shareholders or employees. *See, e.g.*, *Radol v. Thomas*, 772 F.2d 244, 258

fiduciary duties to her by terminating her and refusing to pay her the compensation that she had earned. (Am. Compl., ¶¶ 55–56; ECF No. 47, PAGEID # 1346.) But a fiduciary relationship requires "more than the ordinary relationship of employer and employee," *State ex rel. Charlton v. Corrigan*, 521 N.E.2d 804, 806 (Ohio 1988) (citation omitted), so Ms. Forsman's position at Choice Recovery did not create a fiduciary duty to her. It is true that controlling or majority shareholders generally owe fiduciary duties to minority shareholders. *Crosby v. Beam*, 548 N.E.2d 217, 219 (Ohio 1989). But the parties agree that neither the Employment Agreement nor the Holder's Agreement granted Ms. Forsman any ownership in Choice Recovery (Forsman Dep., 34:15-20, 37:3-14, 45:5-11; First Silverstein Aff., ¶ 8), so she was not owed a fiduciary duty as a minority shareholder.

Courts also look to whether a fiduciary duty exists because of "an informal relationship where both parties understand that a special trust or confidence has been reposed." *Thompson v. Cent. Ohio Cellular, Inc.*, 639 N.E.2d 462, 468 (Ohio Ct. App. 1994) (citing *Stone*, 419 N.E.2d at 1097–98). A fiduciary relationship may "be proven by showing acts and conduct of the parties from which the fact may be inferred that the parties have agreed to become partners." *Brewster v. Bigham*, No. 2004–L–113, 2005 WL 3047491, at *2 (Ohio Ct. App. Nov. 15, 2005) (citation omitted); *see also Madden Investment Co. v. Stephenson's Apparel*, 832 N.E.2d 780, 782 (Ohio Ct. App. 2005) ("In the absence of a written partnership agreement, an

---

(6th Cir. 1985); *Yonkov v. Maximus Holding Grp. LLC*, No. 1:23 CV 1317, 2024 WL 2300967, at *4 (N.D. Ohio May 21, 2024).

27

implied partnership can be found from the totality of attendant facts and circumstances."). But beyond asserting that she held an Interest in Choice Recovery and was entitled to an Income Incentive (ECF No. 47, PAGEID # 1345; ECF No. 61, PAGEID # 1902), Ms. Forsman does not meaningfully engage in an analysis of how the circumstances in this case create a fiduciary duty on Mr. Silverstein's part. That she had a contractual right to be paid an incentive and a portion of the sale proceeds does not create a fiduciary relationship between them.

Ms. Forsman's reliance on *Rhodes v. Paragon Molding, Ltd.*, No. 24491, 2011 WL 3808102, at \*4–5 (Ohio Ct. App. Aug. 26, 2011), does not change this conclusion. In that case, when plaintiff Rhodes sold his company to the defendant, he continued to work for the company and kept a 35% value in one of the divisions of the company. *Id.* When he was fired, Rhodes brought suit, alleging that the defendant breached its fiduciary duty to him as co-owner of a division. *Id.* The court found evidence that an implied partnership existed between the parties, primarily because the purchase agreement allowed Rhodes to "maintain" value in the division, meaning that the parties intended for him to retain some ownership and become a minority shareholder in the division. *Id.* Here, Ms. Forsman never had an ownership interest in Choice Recovery, so there was no ownership interest to "maintain." At all times, she was an employee of Choice Recovery, with a relationship governed entirely by contract.

The Court **GRANTS** summary judgment to Defendants and **DENIES** summary judgment for Ms. Forsman on this claim.

### 4. Wrongful Termination (Count III)

Ms. Forsman next contends that in December 2022, Mr. Silverstein caused Choice Recovery to wrongfully terminate her in bad faith and in violation of public policy. (ECF No. 47, PAGEID # 1347, 1349; Am. Compl., ¶ 59.) Although Ms. Forsman argues elsewhere that she was *not* terminated because she had started working at Wakefield (ECF No. 58, PAGEID # 1820–21), the Court need not address this inconsistency because she has not met the elements of her claim.

Ohio is an at-will employment state, meaning that an employer generally may terminate an employee for any reason not contrary to law without the termination giving rise to a wrongful termination claim. *Collins v. Rizkana*, 652 N.E.2d 653, 656 (Ohio 1995). However, an employee may have a cause of action for wrongful discharge in violation of public policy if she "is discharged or disciplined in contravention of a clear public policy articulated in the Ohio or United States Constitution, federal or state statutes, administrative rules and regulations, or common law." *Dohme*, 956 N.E.2d at 829.

The caselaw recognizing common-law claims for wrongful discharge in violation of public policy speaks solely in terms of the liability of an "employer." *See, e.g., Arthur v. Armco, Inc.*, 122 F. Supp. 2d 876, 880 (S.D. Ohio 2000) (Sargus, J.); *Mitchell v. Fujitec Am., Inc.*, 518 F. Supp. 3d 1073, 1089 n.2 (S.D. Ohio 2021) (Cole, J.). Because Mr. Silverstein was not Ms. Forsman's employer, she cannot maintain a wrongful termination action against him, and the Court **GRANTS** summary judgment to Mr. Silverstein on this claim.

29

As to Choice Recovery, Ms. Forsman was an at-will employee. (Employment Agreement, Section 6.) To prevail on her wrongful termination claim against Choice Recovery, Ms. Forsman must show that (1) a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law; (2) dismissing employees under circumstances like those involved in her dismissal would jeopardize the public policy; (3) her dismissal was motivated by conduct related to the public policy; and (4) Choice Recovery lacked overriding legitimate business justification for the dismissal. *Dohme*, 956 N.E.2d at 829 (quoting *Painter v. Graley*, 639 N.E.2d 51, 54 (Ohio 1994)). The first two elements, "both of which involve relatively pure law and policy questions," are to be determined by the Court. *Collins*, 652 N.E.2d at 658. The second two elements are questions of fact. *Id.*

Assuming without deciding that Ms. Forsman has satisfied the first legal element, she has not established the second element. The analysis of the second element requires, among other things, "inquiring into the existence of any alternative means of promoting the particular public policy to be vindicated by a wrongful-termination-in-violation-of-public-policy claim." *House v. Iacovelli*, 152 N.E.3d 178, 182 (Ohio 2020); *see also Cruz v. English Nanny & Governess School Inc.*, 92 N.E.3d 143, 145 (Ohio Ct. App. 2017) ("Only when a remedy does not already exist, or is inadequate, will a court allow a common-law tort claim for wrongful discharge in violation of public policy."). In this case, Ms. Forsman has an alternative means of promoting her identified public policy of ensuring employees

are paid for services previously rendered under an employment agreement—namely, her breach of contract claim. Ms. Forsman's wrongful termination claim is based on Choice Recovery's alleged nonpayment of compensation (ECF No. 47, PAGEID # 1349), but compensation is squarely governed by the Employment Agreement and the Holder's Agreement. "[P]rotection for economic losses should arise under the bargained-for contract" rather than be recoverable under tort. *Middleton v. Rogers Ltd., Inc.*, 804 F. Supp. 2d 632, 639 (S.D. Ohio 2011) (Beckwith, J.) (citing *Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624, 630–31 (Ohio 1989)).

Summary judgment in favor of Choice Recovery is **GRANTED** on this claim. Summary judgment is **DENIED** as to Ms. Forsman.

### 5. Accounting (Count VI)

Ms. Forsman seeks an accounting of "all credits, debits, and other accounting entries pertaining to Silverstein's treatment of the finances of Choice [Recovery]." (Am. Compl., ¶ 71.)

An accounting is "a species of disclosure, predicated upon the legal inability of a plaintiff to determine how much, if any, money is due him from another." *Bradshaw v. Thompson*, 454 F.2d 75, 79 (6th Cir. 1972). It is an extraordinary remedy and, like other equitable remedies, is available only when legal remedies are inadequate. *Id.*; *see also McNulty v. PLS Acquisition Corp.*, Nos. 79025, 79125, 79195, 2002 WL 31875200, ¶ 80 (Ohio Ct. App. Dec. 26, 2002) ("[W]here there is an adequate remedy at law, an equitable remedy is improper.").

"Equitable accounting actions are rare since the advent of the Federal Rules of Civil Procedure because the liberal standards of the Rules generally afford plaintiffs the opportunity to obtain discovery relevant to their asserted claim." *Boland v. First Winthrop Corp.*, No. 1:09-cv-218, 2010 WL 3037076 (S.D. Ohio Aug. 2, 2010) (Dlott, J.). "In light of the broad discovery available to litigants, accounting actions are of dubious utility." *Digital 2000, Inc. v. Bear Commc'ns., Inc.*, 130 Fed. App'x 12, 23 (6th Cir. 2005) (applying Michigan law); *see also Bradshaw*, 454 F.2d at 79 ("[An accounting] is an extraordinary remedy, and like other equitable remedies, is available only when legal remedies are inadequate; the liberal discovery procedures of the Federal Rules operate to make the legal remedies more 'adequate' than before.").

Ms. Forsman has failed to show that this is the rare case in which a claim for equitable accounting will lie despite the availability of discovery under the Federal Rules of Civil Procedure. To the extent she is dissatisfied with Defendants' discovery responses, her remedy was to file a motion to compel under Rule 37.

The Court **GRANTS** summary judgment to Defendants and **DENIES** summary judgment to Ms. Forsman on her claim for an accounting.

### 6. Declaratory Judgment (Count I) and Declaratory Judgment Counterclaim

The Declaratory Judgment Act provides that a district court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 938 (S.D. Ohio 2012)

(Rice, J.) (quoting 28 U.S.C. § 2201(a)). Courts have discretion to decide whether to entertain a declaratory judgment action and routinely "deny declaratory relief if an alternative remedy is better or more effective." *Grand Trunk Western R. Co. v. Consolidated Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984) (citing cases). Courts also consistently find that declaratory relief is inappropriate when "claims have already ripened into a cause of action." *Miami Valley*, 852 F. Supp. 2d at 938.

Ms. Forsman seeks a declaratory judgment that she is entitled to her share of the sale proceeds, the ERC Credits, and the company's income and equity as described above and that she is not required to repay any sums to Choice Recovery. (Am. Compl., ¶¶ 51–53.) On the other side, Choice Recovery seeks a declaratory judgment that Ms. Forsman is not an equity shareholder, is not entitled to the sale proceeds or any additional incentive-based compensation, and forfeited any rights to past or future Interest. (Answer, PAGEID # 291.) These issues are undeniably connected with and subsumed by the breach of contract dispute. Ms. Forsman's compensation and shareholder status are directly governed by the Employment Agreement and the Holder's Agreement

Ms. Forsman's declaratory judgment claim has already ripened into a cause of action for breach of contract, such that declaratory judgment on these issues is "duplicative and unnecessary." *Gregor v. Rice Drilling D, LLC*, No. 2:21-CV-3999, 2024 WL 169119, at *4 (S.D. Ohio Jan. 16, 2024) (Deavers, M.J.). Choice Recovery's counterclaim is also encompassed by the Court's determination of the breach of contract claim. Accordingly, both Ms. Forsman's claim (Count I) and Choice

Recovery's counterclaim for declaratory judgment are **DISMISSED**.

## V. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (ECF No. 39) and Ms. Forsman's Motion for Summary Judgment (ECF No. 47) are **GRANTED in part** and **DENIED in part**.

Summary judgment is **GRANTED** in favor of Ms. Forsman on her breach of contract claim (Count IV) as to her portion of the sale proceeds ($109,350 for the escrow funds and $486,000 plus interest for the promissory note) and her Income Incentive for 2022. Summary judgment is **DENIED** as to Defendants on these issues.

Summary judgment is **GRANTED** in favor of Defendants on Ms. Forsman's breach of contract claim (Count IV) as to the ERC funds belonging to Choice Recovery. Summary judgment is further **GRANTED** in favor of Defendants on Ms. Forsman's claims for wrongful termination (Count III), breach of fiduciary duty (Count II), and accounting (Count VI). Summary judgment is **DENIED** as to Ms. Forsman on these issues and claims.

Summary judgment is **DENIED without prejudice** to both parties on Ms. Forsman's breach of contract claim (Count IV) as to the ERC funds belonging to KISS. Ms. Forsman is hereby **ORDERED** to brief the issue of whether she has standing to challenge Choice Recovery's retention of KISS's funds **within fourteen (14) days** from the date of this Opinion and Order. Defendants may respond **within seven (7) days** of Ms. Forsman's filing. No reply brief will be permitted.

34

Ms. Forsman's claims for declaratory judgment (Count I) and unjust enrichment (Count V) and Choice Recovery's counterclaim for declaratory judgment are **DISMISSED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**